UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JOHN COLEMAN,

                Plaintiff,                NOT FOR PUBLICATION
                                                    **MEMORANDUM & ORDER**
    -against-                           19-CV-2149 (CBA) (LB)

UNITED STATES OF AMERICA,

                Defendant.
--------------------------------------------------------x
**AMON, United States District Judge:**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff John Coleman ("Plaintiff") commenced this action against the United States of America ("Defendant"), pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 1346(b), 2671 et seq., seeking damages for injuries he suffered on October 3, 2016, when he slipped and fell in unit J-71 ("Unit J-71") at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. I conducted a three-day bench trial in this matter. (See generally Trial Transcript ("Tr."), December 5, 2024 Transcript, December 6, 2024 Transcript, and December 9, 2024 Transcript.)

Having considered the testimony—including the credibility of the witnesses—and exhibits presented at trial, pursuant the Federal Rule of Civil Procedure ("Rule") 52, I make the following Findings of Facts and Conclusions of Law.[1]

## FINDINGS OF FACT

At trial, I heard testimony from Plaintiff, Jason Murray, Doctor Jonathan Garay[2], Camille Bramble, Kimberly Thompson, Michael Cardew, John Sacco, and John Maffeo. Additionally,

---

[1] Rule 52 provides, in relevant part, that following a bench trial, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).

[2] Doctor Garay's testimony concerned Plaintiff's medical history, including his injuries related to the fall and subsequent treatment. (Tr. 118-229.) Because I do not find Defendant liable, I need not make findings of fact or conclusions of law regarding damages.

1

excerpts from the depositions of Plaintiff and Mr. Sacco were read into the record. Based on the evidence at trial, I make the following findings of fact:[3]

### Physical Layout of Unit J-71

1. Plaintiff served 34 months in the custody of the Federal Bureau of Prisons ("BOP"). (Tr. 35:24-36:1.) On October 3, 2016, Plaintiff was housed in MDC. (Id. 36:6-8.) Plaintiff resided in Unit J-71 for approximately 4 months prior to his slip-and-fall on October 3, 2016 ("Accident"). (Id. 37:14-20.)

2. Unit J-71 is located on the seventh floor of MDC. (Id. 363:3-5.) Unit J-71 had a stainless-steel water fountain ("Fountain") connected to the wall by the entry way area next to the Officers' Station. (Id. 37:21-38:7, 368:24-369:6.) The Officers' Station is where the housing unit officer conducts business and is near the main entrance to Unit J-71. (Id. 91:6-8.) The Officers' Station has one entrance ("Main Door"). (Id. 97:1.) The area in front of the Main Door is referred to as "the Bubble." (Id. 38:8-11.)

3. At the time of the Accident on October 3, 2016, a yellow wet floor sign ("Wet Floor Sign") was placed approximately six feet to the right of the Fountain and approximately five steps from the Main Door. (Id. 47:5-13; Gov. Ex. A ("Video Tr.").) Prison orderlies swept and mopped the entry way area "two or three times a day" and would erect the Wet Floor Sign. (Tr. 41:14-16, 42-44.)

### Maintenance Procedures at MDC in October 2016

4. MDC maintenance and repair issues are coordinated through a computerized work order system called the Total Maintenance System ("TMS"). (Id. 312:5-22.) MDC staff may report repair

---

[3] The relevant exhibits were admitted into evidence by agreement of the parties. (Tr. 111:8-13, 245:16-17, 280:17-18, 290:1-6.)

2

issues directly into TMS which generates a work order. (Id. 364:2-9.) MDC staff can identify repair issues in several ways, including through observations made during rounds and inmate complaints. (Id. 363:21–364:1.)

5. In addition to MDC staff generated work orders, routine preventative maintenance checks are generated automatically through TMS. (Id. 377:1-7.) Water fountains on housing units receive monthly preventative maintenance checks which inspect for, among other things, leaks. (Id. 377:8-24.) If a repair issue is identified during a preventative maintenance check, such as a leak, a work order would be generated. (Id. 377:25-378:2.)

6. When MDC staff submit work orders through TMS, the work orders are pending. (Id. 365:2-9.) A pending work order means that MDC staff entered a work order request into TMS describing an issue that needs to be addressed by the facilities department. (Id. 392:11-14.) A facility supervisor—e.g., a facilities manager or general foreman—reviews pending work order requests, makes them active, and assigns the appropriate facilities staff to resolve each issue. (Id. 365:2-13.) Pursuant to BOP written policy, facilities supervisors have seven days to review, make active, and assign pending work order requests. (Id. 314:21-23, 315:10-13, 365:18-22.) Once a work order is assigned, the assigned staff has up to thirty days to complete a work order. (Id. 385:2-4.)

7. Mr. Maffeo is a BOP employee and has been assigned to MDC since 2006. (Id. 359:7-22.) At the time of the Accident in 2016, Mr. Maffeo was a general foreman whose duties included supervising carpenters, powerhouse, electricians, welders, HVAC, and plumbers. (Id. 360:11-15.) Pursuant to BOP policy, all maintenance requests—whether routine or emergency—are entered into TMS. (Id. 364:23-365:1.) Mr. Maffeo testified that although "typically" all work must be documented in TMS, it is possible for facilities staff to make a quick repair and later forget to put in a work order. (Id. 376:10-18.)

3

**Work Orders Related to the Fountain at MDC**

8. Mr. Maffeo searched TMS from 2009 to the date Plaintiff filed suit on April 11, 2019, and found no record of any work orders or repairs related to water leaks for the Fountain prior to the date of the Accident. (Id. 370:9-376:9.)

9. There were three work orders related to the Fountain after the Accident ("Post-Accident Work Orders"). (Id. 370:9-376:9; Pl. Ex. 2.) Work order 13714 was made active on October 31, 2016, and completed on October 28, 2016. (Pl. Ex. 2 at 1.) According to Mr. Maffeo, a facilities staff member was likely made aware of the pending work order prior to it being assigned through TMS and completed the work on October 28, 2016. (Tr. 397:2-7.) Work order 14579 was made active on December 15, 2016, and completed on December 16, 2016. (Pl. Ex. 2 at 2.) Work order 18564 was made active on August 11, 2017, and completed on August 14, 2017. (Id. at 3.)

10. Mr. Sacco is a BOP employee. (Tr. 310:8-12.) Mr. Sacco worked as a general foreman at MDC from January 2017 to 2022. (Id. 310:17-311:1.) Mr. Maffeo and Mr. Sacco both testified that pursuant to BOP written policy, the Post-Accident Work Orders would have been entered into TMS no earlier than seven days prior to the active date. (Id. 318:9-14, 320:10-13, 373:7-15, 374:21-375:1, 375:24-376:2.) Consequently, I find that the Post-Accident Work Orders were not entered into TMS prior to the Accident.

**Unit J-71 Complaints and Inspections – Prior to the Accident on October 3, 2016**

11. MDC supervisors and staff visit all housing units once every other week. (Id. 367:25-368:1.) During these visits, known as "Mainline," MDC supervisors and staff observe the operations of the housing units, listen to inmate complaints, and address any issues while on the housing unit during that time. (Id. 368:3-13.) During Mainline, Mr. Maffeo did not observe any leaks from the

4

Fountain or receive any complaints about the Fountain prior to the Accident.  (Id. 369:15-18, 376:19-25.)

12. Plaintiff complained to MDC staff about the lack of a microwave in Unit J-71.  (Id. 19:5-8.)  Plaintiff testified that because Unit J-71 did not have a microwave, inmates used the Fountain for hot water to heat up their food, causing water to spill water on the floor near the Fountain.  (Id. 19:22-24, 20:9-11.)  Plaintiff did not recall complaining to MDC staff about water on the floor near the Fountain, but that he believed at some point there was a complaint about the Fountain leaking.  (Id. 20:13-15, 21:23-22:14.)  However, Plaintiff did not see the Fountain leaking any time prior to the Accident.  (Id. 20:16-18.)

### Observations Minutes Before the Accident on October 3, 2016

13. Mr. Murray and Ms. Bramble are BOP employees.  (Id. 89:17-22, 233:2-7.)  During the time of the Accident, Mr. Murray was a teacher and a corrections officer whose responsibilities included making sure the inmates, staff, and institution were secure.  (Id. 89:24-90:13.)  At the time of the Accident, Ms. Bramble was an education technician whose responsibilities included coordinating education programs for the inmates.  (Id. 233:7-14.)

14. Immediately prior to the Accident, Mr. Murray and Ms. Bramble entered the Officers' Station through the Main Door.  (Id. 92:5-10, 251:12-17.)  Mr. Murray and Ms. Bramble did not see any water on the floor near the Bubble or the Fountain and did not see inmates splashing hot water on the floor next to the Fountain.  (Id. 104:9-16, 249:14-21.)

15. Plaintiff also did not see water on the ground.  (Id. 48:14-17.)

5

**Plaintiff's Slip-and-Fall**

16. On October 3, 2016, at approximately 1:27 p.m., Mr. Murray, Ms. Bramble, and Officer Umar[4] walked through the Main Door to the Officers' Station. (Video Tr. 0:00-0:06; Tr. 96:15-18.) At least five people—MDC staff and inmates—walked through or near the Main Door where Plaintiff later fell. (Video Tr. 0:00-0:30.)

17. A few minutes prior to the Accident, Mr. Murray called Plaintiff to the Officers' Station. (Tr. 14:20-21.) Plaintiff walked to the Officers' Station and noticed the Wet Floor Sign on his right. (Id. 46:23-25.) The video shows Plaintiff wore the left pant leg of his standard issue MDC jumpsuit (Gov. Ex. Q) above his ankle while his right pant leg fell below the heel of his shoe contacting the floor. (Video Tr. 0:00-0:30.) Plaintiff arrived at the Bubble and walked through the Main Door into the Officers' Station. (Id. 0:14-0:21). Mr. Murray told Plaintiff they were not ready and to come back. (Tr. 47:14-16.) Plaintiff exited the Officers' Stations and took seven steps towards the Fountain, stood next to it, and leaned against the wall. (Video Tr. 0:21-0:26.) Two seconds later, Plaintiff was called back to the Officers' Station. (Id. 0:28.) Plaintiff took three steps and as he approached the Main Door, he slipped. (Id. 0:28-0:33.) The video shows that Plaintiff slipped on his right heel and landed on his buttocks. (Id. 0:31-0:33.) Officer Umar immediately checked on Plaintiff and activated his body alarm. (Id. 0:33-0:50; Gov. Ex. K.)

---

[4] Officer Umar did not testify at trial, but his memorandum concerning the Accident was admitted into evidence. (See Gov. Ex. K.) Officer Umar was listed as a prospective witness for both parties. (ECF Docket Entry ("D.E.") # 126.) However, according to Defendant, Officer Umar no longer works for BOP, and it could not locate him. (Tr. 72:2-4.) Further, prior to trial, Magistrate Judge Bloom instructed Plaintiff regarding his responsibilities for getting his witnesses to appear. (D.E. # 121 14:14-17:15) (The Court: If there is a witness that you believe has information you can subpoena them for the time. Mr. Coleman: Oh, myself, okay.) Despite this instruction, Plaintiff did not attempt to subpoena Officer Umar. (Tr. 279:2-5.)

18. After he fell, Plaintiff claims he said to someone that he slipped on water. (Tr. 26:17-18.) While on the ground, Plaintiff testified that his pants were wet and that he saw water. (Id. 49:12-14.)

19. Approximately 12 MDC staff members responded to the scene. (Video Tr. 0:58-11:52.; Tr. 100.) MDC staff did not slip or appear to notice any water on the ground while assisting Plaintiff onto a stretcher. (Video Tr. 0:58-11:52.)

20. Approximately five inmates rushed to use the Fountain after Plaintiff fell. (Id. 1:17-2:17.) The inmates did not slip or appear to notice any water on the ground. (Id.)

21. From review of the video, I could see that Plaintiff's right pant leg was underneath his shoe heel when he slipped which provided a possible explanation to his otherwise inexplicable fall. (Id. 0:31-0:32.)

22. Plaintiff was taken to the hospital and because of the Accident, Plaintiff suffered a broken fibula and tibia in his left leg which required two surgeries. (Tr. 27:13-19, 414:12-15.)

**MDC Staff Reports – After the Accident**

23. Mr. Murray and Ms. Bramble were both required to report incidents that happened in the housing units. (Id. 105:18-20; 244:21-24.) Following the Accident, both Mr. Murray and Ms. Bramble produced reports. (Id. 106:4-7, 245:23-25; Gov. Exs. N, P.) Neither report mentioned whether the floor was wet in the area where Plaintiff fell. (Gov. Exs. N, P.) If Mr. Murray and Ms. Bramble had noticed water where Plaintiff fell, they would have included that in their reports. (Tr. 106:10-14; 249:3-13.)

7

24. Officer Umar also produced a report after the Accident. (Gov. Ex. K.) His report stated that although "there was a wet area sign about 3 feet from where Coleman slipped . . . the area where Coleman slipped was dry." (Id.)

25. Mr. Maffeo testified that had someone slipped and fell because of a water leak in Unit J-71, maintenance would have been called to respond to fix the leak. (Tr. 378:3-9.)

26. In light of the contradictory evidence, including Mr. Murray's and Ms. Bramble's testimony and reports, Officer Umar's report, TMS maintenance records, and the surveillance video, I do not credit Plaintiff's testimony that he saw water on the ground after he fell.

27. Based on the foregoing testimony and evidence, I find that Plaintiff has failed to establish by a preponderance of the evidence that on October 3, 2016, at approximately 1:28 p.m., he slipped and fell because of a wet condition originating from the Fountain or elsewhere.

## **CONCLUSIONS OF LAW**

FTCA claims are governed by the law of the state where the alleged accident occurred. Borley v. United States, 22 F.4th 75, 78 (2d Cir. 2021). Here, Plaintiff's injury occurred within the State of New York. Accordingly, New York law applies. Id.

Under New York Law, to prevail on a negligence claim a plaintiff must establish: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Id. (quoting Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333 (1981)). In this case, the "duty" at issue is akin to that of "a landlord, property owner, or tenant in possession of real property with common areas." Gioeli v. United States, No. 14-CV-6806 (KAM) (ST), 2018 WL 6191833, at *11 (E.D.N.Y. Nov. 28, 2018). "A property owner has a duty to maintain his or her property in a reasonably safe condition." Torres v. La Borinquena

8

HDFC, Inc., 216 N.Y.S.3d 230, 231 (N.Y. App. Div. 2024) (citing Kellman v. 45 Tiemann Assocs., Inc., 87 N.Y.2d 871, 872 (1995)).

To establish negligence in a slip-and-fall case under New York Law, a plaintiff must prove: "(1) that a hazardous or dangerous condition existed; (2) that the defendant either created the condition or had actual or constructive knowledge of it and failed to correct it within a reasonable time after acquiring such knowledge; and (3) that the plaintiff's injury was proximately caused by the hazardous or dangerous condition." Leonardi v. United States, No. CV 11-4827 (LDW) (GRB), 2013 WL 5295714, at *2 (E.D.N.Y. Sept. 18, 2013) (citing Wisner v. United States, No. 92-CV-445, 1994 WL 698626, at *3 (N.D.N.Y. Dec. 5, 1994)); see Walsh v. Super Value, Inc., 904 N.Y.S.2d 121, 125 (N.Y. App. Div. 2010) (quotation omitted); see, e.g., Putnam v. Stout, 38 N.Y.2d 607, 612 (1976). A plaintiff must establish each element by a preponderance of the evidence. See, e.g., Wild v. Catholic Health Sys., 21 N.Y.3d 951, 955 (2013).

Based on the facts adduced at trial, I conclude that Plaintiff has failed to establish that Defendant breached its duty of care. For the reasons discussed below, Defendant is not liable for Plaintiff's injuries.

**Dangerous Condition**

The first question is whether the condition of the floor near the Officers' Station and Fountain was a "dangerous condition" such that Defendant could be liable for injuries the condition caused. I find that Plaintiff failed to prove that the condition of the floor was hazardous or dangerous.

Plaintiff contends that "obviously" there was "water there" because "[y]ou do not fall like I fell and sustain the injuries like I did when there is no water there." (Tr. 18:14-20.) In support

9

of this conclusion, Plaintiff provides his testimony that after he fell, he told someone he slipped on water and that his clothes were wet. (Id. 26:17-18, 49:12-14.) However, I found Plaintiff's statements not credible. The overwhelming weight of the evidence and testimony presented at trial does not establish that water was present on the floor where Plaintiff fell; instead, as noted, the video evidence suggests another explanation for his fall.

First, Officer Umar's report stated that "the area where Coleman slipped was dry." (Gov. Ex. K.) Similarly, Mr. Murray's and Ms. Bramble's reports did not mention whether the floor where Plaintiff fell was wet, but they testified that if they had noticed water it would have been included in their reports. (Id. N, P.) Second, consistent with their reports, Mr. Murray and Ms. Bramble testified that they did not see any water on the floor immediately before Plaintiff fell. (Tr. 104:9-16, 249:14-21.) Plaintiff also did not see any water on the floor prior to his fall. (Tr. 48:14-17.) Finally, numerous MDC staff and inmates—including Plaintiff—walked in the same area where Plaintiff fell before the Accident, and no one slipped or looked down in a manner that suggests water was present. (Video Tr. 0:00-12:52); see Estrella-Jones v. United States, No. 13-CV-5454 (CBA) (LB), 2016 WL 7243540, at *4 (E.D.N.Y. Dec. 14, 2016) (finding evidence that "300 people per day traversed" the area where the plaintiff fell "without any prior incidents" relevant to determining that a dangerous condition did not exist), aff'd, 706 F. App'x 28 (2d Cir. 2017), as amended (Dec. 21, 2017).

The fact that Plaintiff did slip and fall, without more, does not establish that a dangerous condition existed. See, e.g., Lewis v. Metro. Transp. Auth., 472 N.Y.S.2d 368, 372 (N.Y. App. Div. 1984) ("The mere happening of the accident does not establish liability on the part of the defendant."), aff'd, 64 N.Y.2d 670 (1984). Moreover, as earlier noted, video evidence suggests an

10

alternative explanation for Plaintiff's fall: that he slipped on one leg of his pants, which was underneath his shoe when he fell.

### Notice

Even assuming that there was water on the floor where Plaintiff slipped, Defendant must have created or had actual or constructive knowledge of that condition for it to be actionable. Plaintiff does not claim that Defendant affirmatively created the dangerous condition.[5] The only issue, then, is whether Defendant had actual or constructive notice of the condition.

### Actual Notice

Plaintiff failed to prove that Defendant had actual notice of the alleged dangerous condition. Actual notice requires a showing that "the defendant[] [was], in fact, aware of the dangerous condition." Quarles v. Columbia Sussex Corp., 997 F. Supp. 327, 332 (E.D.N.Y. 1998); Nussbaum, 603 F. App'x at 12 ("Actual notice requires that a defendant receive complaints or similarly be alerted to the existence of the dangerous condition.")

Here, there were no work orders related to a possible source of the water—namely, leaks from the Fountain—between 2009 and the date of the Accident.[6] Further, during Mainline inspections, Mr. Maffeo did not observe leaks from the Fountain or receive any complaints that

---

[5] Even if Plaintiff did attempt to claim Defendant affirmatively created the dangerous condition, there is no evidence or testimony "point[ing] to some affirmative act" by Defendant that created the danger. Burden v. Wal-Mart Stores E., LP, No. 17-CV-1289 (KMK), 2018 WL 4680025, at *4 (S.D.N.Y. Sept. 28, 2018) (quotation omitted); see also Nussbaum v. Metro-North Commuter R.R., 603 F. App'x 10, 12 (2d Cir. 2015) (to prove that the defendant created the dangerous condition, the plaintiff must show that the defendant not only "knew or had reason to know of the condition, but that the defendant knew or had reason to know of the danger, i.e., that the condition it created was dangerous") (citation omitted).

[6] Plaintiff's reliance on the Post-Accident Work Orders is "not admissible as proof of negligence or culpability because [that evidence] is irrelevant on the issue of the defendant's level of care at the time of the alleged incident." Christian v. United States, 859 F. Supp. 2d 468, 474 (E.D.N.Y. 2012); see, e.g., Winne v. Town of Duanesburg, 927 N.Y.S.2d 209, 211 (N.Y. App. Div. 2011) ("[A]ctions after the accident are not directly relevant to [a] defendant's liability . . . .") (citation omitted).

the Fountain leaked. On the day of the Accident, Mr. Murray, Ms. Bramble, and Plaintiff did not see any water on the ground in the area where Plaintiff fell. Moreover, Plaintiff did not recall complaining to MDC staff about water being on the floor near the Fountain; instead, he claims that at some point there was a complaint about the Fountain leaking. See Feis v. United States, 484 F. App'x 625, 628 (2d Cir. 2012) (finding that the plaintiff's assertion that "he had previously complained about water on the floor" was "not enough to support the inference that" the defendant was aware of the wet floor on the day of the plaintiff's fall).

Further, the Wet Floor Sign does not establish that Defendant had actual notice. Plaintiff testified that the Wet Floor Sign was erected after orderlies swept and mopped; not because the Fountain was leaking. The placement of the Wet Floor Sign also does not support finding that Defendant had actual notice of water by the Fountain or the Main Door. Indeed, Plaintiff testified that he did not fall where the Wet Floor Sign was placed and that the Wet Floor Sign should have been placed where he fell by the Main Door. (Tr. 430:9-16.) Plaintiff also testified that "just because it's a wet floor sign, doesn't mean there's water there." (Id. 44:8-9.) Plaintiff's own testimony—that the orderlies erected the Wet Floor Sign after cleaning—does not support finding that the Wet Floor Sign was placed in response to alleged leaks from the Fountain or water by the Main Door. See Bogery v. United States, No. 17-CV-6996 (VEC), 2018 WL 4265901, at *4 (S.D.N.Y. Sept. 6, 2018) (no actual notice because "[n]othing in the record suggests that the [wet floor] sign was placed there in response to a complaint that [d]efendant received or because an employee saw the alleged [condition]"). Thus, Plaintiff has not "link[ed] the placement of the sign to the . . . water identified by [him] as the cause of [his] fall." Mahoney v. Whole Foods Mkt. Grp., Inc., No. 21-CV-4127 (MKB), 2025 WL 486655, at *7 (E.D.N.Y. Feb. 12, 2025) (citation omitted); see also Cousin v. White Castle Sys., Inc., No. 06-CV-6335 (JMA), 2009 WL 1955555,

12

at *8 (E.D.N.Y. July 6, 2009) ("[T]he fact that a yellow caution sign may have been near plaintiff's fall does not salvage plaintiff's claim because absent facts tending to link the placement of the sign to the puddle of soda and water identified by plaintiff as the cause of her fall, there is no reasonable basis to conclude that defendant was aware of that particular hazard.") (citation omitted).

Accordingly, I find that Plaintiff failed to establish by a preponderance of the evidence that Defendant had actual notice of the alleged dangerous condition. See Strass v. Costco Wholesale Corp., No. 14-CV-06924 (PKC) (VMS), 2016 WL 3448578, at *4 (E.D.N.Y. June 17, 2016) (no actual notice where the plaintiff merely made "conclusory references to 'actual notice'" but failed to "identify any evidence that would support a finding that" the defendant was aware of the condition that caused the plaintiff's fall).

## Constructive Notice

Plaintiff also failed to prove that Defendant had constructive notice of the alleged dangerous condition. "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." Arbit v. Costco Wholesale Corp., 218 N.Y.S.3d 125, 126-127 (N.Y. App. Div. 2024) (quoting Gordon v. Am. Museum of Nat. Hist., 67 N.Y.2d 836, 837 (1986)); see also Bynoe v. Target Corp., 548 F. App'x 709, 710 (2d Cir. 2013) (same). "The mere existence of a foreign substance, without more, is insufficient to support a claim of negligence. . . . Rather, there must be evidence . . . establishing either how the substance got there or how long it was there before the fall." Lionel v. Target Corp., 44 F. Supp. 3d 315, 320 (E.D.N.Y 2014) (quotations omitted). Moreover, a "general awareness" that a dangerous condition "may be present" is insufficient to charge a defendant with constructive notice of the specific condition that caused a plaintiff's injury. Gordon, 67 N.Y.2d at 838.

13

Here, Plaintiff produced no evidence to support finding that the condition was "visible and apparent" and existed "for a sufficient length of time prior to the accident." Arbit, 218 N.Y.S.3d at 126-127. On the day of the Accident, minutes before he fell, Plaintiff did not notice any water on the ground – an observation buttressed by the testimony of Mr. Murray and Ms. Bramble. See Killeen v. Our Lady of Mercy Med. Ctr., 827 N.Y.S.2d 19, 20 (N.Y. App. Div. 2006) (finding no constructive notice where "[t]here were no known complaints of a hazardous condition, and even plaintiff had not noticed the [condition] before he fell"); Carricato v. Jefferson Valley Mall Ltd. P'ship, 749 N.Y.S.2d 575, 576 (N.Y. App. Div. 2002) (collecting cases for the same). Further, Plaintiff did not provide any evidence indicating how long the water was present prior to the Accident. See Casierra v. Target Corp., No. 09-CV-1301 (JG) (MDG), 2010 WL 2793778, at *3 (E.D.N.Y. July 12, 2010) (no constructive notice because there was "simply no evidence" as to how long the substance was on the floor prior to the plaintiff's fall); Stephanides v. BJ's Wholesale Club, Inc., No. 12 CV 0083 (CLP), 2013 WL 1694901, at *5, 9 (E.D.N.Y. Apr. 18, 2013) (collecting cases for the same). Accordingly, a preponderance of the evidence fails to show that Defendant constructively knew about the condition of the floor. See Borley, 22 F.4th at 81 ("New York courts have hesitated to find constructive notice" for slip-and-fall injuries caused by slippery floors). Thus, Defendant is not liable for Plaintiff's injury.

## CONCLUSION

For the above reasons, Plaintiff has failed to prove his claim against Defendant. The Clerk of Court is directed to enter judgment for Defendant and to close the file.

SO ORDERED.

Dated: March 21, 2025
Brooklyn, New York

                                            s/Carol Bagley Amon
                                            Carol Bagley Amon
                                            United States District Judge